# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

LACINDA RIETVELD,                                    CIVIL NO. 06-2810 (RHK/AJB)

           PLAINTIFF,

V.                                                   REPORT AND RECOMMENDATION ON THE
                                                     PARTIES' CROSS MOTIONS
                                                     FOR SUMMARY JUDGMENT

LINDA MCMAHON, ACTING COMMISSIONER OF
SOCIAL SECURITY,

           DEFENDANT.

---

Jennifer G. Mrozik, Esq., for Plaintiff, Lacinda Rietveld

Lonnie F. Bryan, Assistant United States Attorney, for Defendant, the Commissioner of Social
Security.

---

## I.     INTRODUCTION

Lacinda Rietveld ("Plaintiff") disputes the unfavorable decision of the Commissioner of the

Social Security Agency ("Commissioner") denying her claim for a period of disability and disability

insurance benefits under Title II of the Social Security Act.  This matter is before the court, United

States Magistrate Judge Arthur J. Boylan, for a report and recommendation to the District Court on the

parties' cross motions for summary judgment.  *See* 28 U.S.C. § 636 (b)(1) and Local Rule 72.1.

Based on the reasoning set forth below, this Court **recommends** that Plaintiff's Motion for Summary

Judgment **be DENIED** [Docket No. 8] and that the Commissioner's Motion for Summary Judgment

[Docket No. 15] **be GRANTED.**

## II.   ISSUES BEFORE THE COURT

The primary issues before the Court are: (1)  whether Administrative Law Judge ("ALJ") David K. Gatto erred in discounting the treating physician's opinion; (2) whether the ALJ erred in his determination of Plaintiff's credibility; and (3) whether substantial evidence supports the ALJ's finding that Plaintiff could perform the jobs of a parking lot attendant, press tender, or assembly machine tender.

## III.   PROCEDURAL HISTORY

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on December 5, 2002, alleging disability as of November 17, 2002.  (Tr. 79-82, 90).  The state agency denied Plaintiff's claim initially and on reconsideration.  (Tr. 33-40, 43-45).  Plaintiff made a timely request for a hearing.

On April 28, 2005, ALJ Gatto conducted an administrative hearing regarding Plaintiff's application for DIB.  On August 25, 2005,  ALJ Gatto issued an unfavorable decision, finding that while Plaintiff was not able to perform her past relevant work, she was able to perform other jobs which existed in significant numbers in the economy.  (Tr. 14-30).  Plaintiff filed a request for review to the Appeals Council.  The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Based on the Commissioner's final decision denying DIB, Plaintiff filed an action in this Court to reopen the matter.  Both parties have filed motions for summary judgment.

## IV.   FACTUAL BACKGROUND AND MEDICAL HISTORY

Plaintiff was born July 26, 1969, and was 36 years old at the time of the ALJ's decision. Plaintiff has a high school education.  (Tr. 96).  Plaintiff previously worked as a housekeeper and

cashier.  (Tr. 158).  Plaintiff asserts that she is unable to work because of "a seizure disorder, migraine headaches, depression, and a somatoform disorder."  [Docket No. 9].

On December 2, 2002, Plaintiff's primary care physician, Dr. Lawrence Deal, noted that Plaintiff had a stroke in May and November 2002.  (Tr. 204).  Dr. Deal noted that Plaintiff had residual left-sided weakness as a result of the stroke.  (Tr. 204).  Dr. Deal observed that Plaintiff used a cane because she had some difficulty walking.  (Tr. 204).  Dr. Deal also reported that Plaintiff is a smoker.  (Tr. 204).

On January 6, 2003, Dr. Deal noted that a neurologist prescribed migraine medication for Plaintiff.  (T. 203).   Dr. Deal also noted that Plaintiff was taking Depakote[1] and Premarin.[2]  (T. 203).  Plaintiff complained of occasional chest pain, but Dr. Deal did not feel that it was cardiac.  Dr. Deal advised her to try to exercise and use hand weights to strengthen her upper body.  Dr. Deal noted that Plaintiff's walking had improved and therefore did not always need to use a cane.  (Tr. 203).

On January 16, 2003, Plaintiff went to the emergency room with complaints of weakness and dizziness.  (Tr. 167).  While there, Plaintiff complained of chest pain.  (Tr. 166).  The hospital discharged Plaintiff the following day with diagnoses of chest pain which was likely noncardiac; left-sided numbness/weakness with negative work-up; and a history of high cholesterol.  (Tr. 166).

On January 18, 2003, Plaintiff returned to the emergency room complaining of chest pain and weakness.  (Tr. 195).  A cardiac chest x-ray and an electrocardiogram were both normal.  (Tr. 196).

---

[1]Depakote is used to treat certain types of seizures and convulsions. *The PDR Family Guide to Prescription Drugs*, Three Rivers Press (8th ed. 2000).

[2]Premarin "is an estrogen replacement drug.  The tablets are used to reduce symptoms of menopause . . . ."  *Id.*

Dr. William Keig indicated that Plaintiff's symptoms may be due to a conversion reaction.[3]  (Tr.196).

On January 24, 2003, Dr. Deal noted that Plaintiff's neurologist had concluded that Plaintiff did not suffer a stroke a few months earlier and all the testing was normal. (Tr. 202).  Nonetheless, Dr. Deal indicated that Plaintiff's chest pain and stroke were likely due to stress.  Dr. Deal noted that Plaintiff's neurologic testing was normal.  Dr. Deal also indicated that Plaintiff had a four out of nine for the depression criteria, but did not think she needed an antidepressant at that time.  (Tr. 202).

On January 31, 2003, Plaintiff saw Dr. Patricia Groeschel, a neurologist.  (Tr. 208).  Dr. Groeschel reported that Plaintiff's complaints of weakness were not present during the examination.  (Tr. 208).  Dr. Groeschel also reported that Plaintiff walked fine and did not need a cane.  (Tr. 208).  Dr. Groeschel indicated that Plaintiff's problems were due to depression.  (Tr. 209).  Plaintiff stated that she did not want medication for her depression.  (Tr. 209).

On March 5, 2003, Dr. Thomas Luth, a primary care physician, reported that Plaintiff was new to their clinic.  (T. 234).  Dr. Luth noted that Plaintiff's records showed a history of recent emergency room visits, and a history of multiple treating physicians and psychiatrists.  (Tr. 234).   Plaintiff  reported a past history of heavy drug abuse, including cocaine and marijuana.  Plaintiff indicated that she had been sober for 14 years, but continues to have short-term memory loss from her days of [drug] overuse."  (Tr. 234).   Dr. Luth assessed Plaintiff with "chronic stress and depression, possible old stroke, [and]  possible mental impairment secondary to drug abuse in the past."  (Tr. 234).

_____

[3]A conversion reaction is "a psychoneurosis in which bodily symptoms (as paralysis of the limbs) appear without physical basis . . . ." *MedlinePlus Encyclopedia* at http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=conversion%20reaction

Dr. Luth reported that Plaintiff was not in active treatment or psychotherapy.  (Tr. 234).  Dr. Luth offered Plaintiff many treatment alternatives, but Plaintiff declined most.  (Tr. 234).  Dr. Luth  gave Plaintiff a trial sample of Zyprexa for chronic depression, anxiety, and mood swings.  (Tr. 234).  Dr. Luth recommended that Plaintiff see a psychiatrist, but she declined the referral.  (Tr. 234).

On March 19, 2003, Plaintiff's therapist at the Mental Health Center closed Plaintiff's case because she "chose not to pursue therapy."  (Tr. 289).  On May 4, 2003, Plaintiff went to the emergency room with complaints of left shoulder pain.  (Tr. 214-15).  However, an x-ray showed no acute abnormality.  (Tr. 217).

On May 6, 2003, Plaintiff went to see Dr. Luth for a follow up on her left shoulder, but "she had a fainting spell in the lobby."  (Tr. 233).  Plaintiff was taken to the emergency room and her vital signs were found to be stable.  The treatment note indicated that "[s]he came to spontaneously and eventually was able to converse and be completely oriented to person and place."  (Tr. 233).

On May 9, 2003, Dr. Luth noted that Plaintiff had memory difficulty.  Plaintiff reported that she had locked herself out of the house "because she couldn't remember the combination lock to get back in."  (Tr. 232).  Dr. Luth diagnosed Plaintiff with a "[p]ossible recurrent seizure disorder on low dose of Depakote."  (Tr. 232).  Dr. Luth noted that Plaintiff's "[l]ast measurement was very subtherapeutic" and increased her dosage of Depakote to two tablets daily.  (Tr. 232).

On June 13, 2003, Plaintiff went to the emergency room complaining of a trembling episode, which she thought was a seizure.  (Tr. 221).  Dr. James S. Parker noted that Plaintiff was hyperventilating and anxious.  (Tr. 221).  Plaintiff reported that the trembling episodes lasted three to

four minutes and occurred two to three times a week.  (Tr. 219).  Dr. Parker noted that Plaintiff's

neurological examination was normal.  (Tr. 220).  Dr. Parker also noted that the trembling episodes did

not appear consistent with seizure activity and were more likely panic attacks.  (Tr. 221).  Dr. Parker

stated that "[t]he patient and her husband both seemed resistant to this idea."  (Tr. 221).  Dr. Parker

recommended that Plaintiff try Ativan[4] for further episodes (Tr. 221).

On June 19, 2003, Plaintiff complained to Dr. Luth that she was "having intermittent pseudo

seizures per Dr. Aggarwal's recommended diagnosis classification."  (Tr. 232).  Dr. Luth noted that

EEG's were negative for seizure activity.  (Tr. 232).   Dr. Luth indicated that Plaintiff's likely diagnosis

was depression.  (Tr. 232).  Dr. Luth opined that Plaintiff should follow through with any

recommendations from psychiatry.  (Tr. 232).

On July 16, 2003, Plaintiff went to the emergency room with complaints that she was unable to

move or feel her arms or legs.  (Tr. 223). Plaintiff had numerous tests which came back normal.  (Tr.

225).  Lori Wegner, LICSW, conducted a mental health crisis evaluation with Plaintiff.  (Tr. 225).

Plaintiff reported that her husband was emotionally and physically abusive to her.  (Tr. 225).  Ms.

Wegner noted that Plaintiff appeared depressed and minimized her problems and the affect they had on

her.  (Tr. 225).  Ms. Wegner concluded that Plaintiff did not have a conversion disorder.  (Tr. 225).

Ms. Wegner recommended that Plaintiff attend an outpatient mental health treatment center to deal with

these  issues.  (Tr. 226).  Plaintiff indicated that she was not interested in any mental health services.

(Tr. 226).

---

[4]Ativan is used for the treatment of anxiety disorders. *The PDR Family Guide to Prescription Drugs*, Three Rivers Press (8th ed. 2000).

On July 28, 2003, Plaintiff saw Dr. Luth for follow-up on her pseudo seizures.  Dr. Luth noted that Plaintiff's intermittent headaches were primarily controlled by Depakote.  (Tr. 273).  Dr. Luth also noted that Plaintiff continued "to have half-hour spells of decreased spontaneity and a feeling of overall body numbness" which resolved after a half hour.  (Tr. 273).  Dr. Luth increased Plaintiff's Risperdal,[5] from .5 mg to 1 mg daily.  (Tr. 273).

On August 5, 2003, Plaintiff met with Carol Leinonen, a licensed psychologist.  Plaintiff reported significant memory problems.  (Tr. 241).  Plaintiff reported that she has experienced "the shakes" and muscle weakness.  (Tr. 241).

Ms. Leinonen reported that Plaintiff's long and short-term memory seemed okay "because she was able to recall details and events regarding her symptoms and current problems."  (Tr. 242).  Ms. Leinonen indicated that Plaintiff "was able to understand, but appeared to have mild difficulties with retaining and following simple verbal directions."  (Tr. 243).  Plaintiff also "had some minor difficulties with completing simple mental tasks requiring minimal pace and persistence."  (Tr. 243).

On August 15, 2003, Dr. Luth noted that Plaintiff's chronic depression and anxiety syndrome was controlled with Risperdal (1 mg daily).  (Tr. 272).   However, Dr. Luth changed Plaintiff's medication to Geodon, an antipsychotic medication, because she complained that Risperdal caused her to gain weight.  (T. 271).

On September 20, 2003, Dr. Joseph Cools, Ph.D., a state agency medical consultant, reviewed the record and opined that there was "no record of a diagnosable psych problem.  (Tr. 259).

---

[5]Risperdal is used to treat severe mental illnesses such as schizophrenia.  *Id.*

On October 14, 2003, Plaintiff requested a work slip.  (Tr. 270.)  Dr. Luth noted that Plaintiff

"remain[ed] continuously disabled due to mental illness." (Tr. 270).  Dr. Luth increased Plaintiff's

Geodon dosage in October 2003 and November 2003.  (Tr. 269-70).

However, Dr. Luth noted that Plaintiff had trouble tolerating the current dose of Geodon.  (Tr.

268).  Dr. Luth's assessment noted "poorly controlled psychotic depression and schizophrenia" and

reduced the Plaintiff's dose of Geodon to 40 mg.  (Tr. 268).

On February 23, 2004, Plaintiff's therapist at the Mental Health Center reported that Plaintiff's

case was closed because Plaintiff met her goals and had a good prognosis (Tr.

285).

On March 15, 2004, Dr. Luth changed Plaintiff's dosage of Geodon to 20 mg in the morning

and 40 mg in the evening.  (Tr. 268).  Dr. Luth referred Plaintiff for a psychiatric evaluation (Tr. 268).

On June 8, 2004, Dr. Luth noted that a psychiatrist diagnosed Plaintiff with a somatoform

disorder.[6]  (Tr. 267).  The psychiatrist recommended "weaning off Geodon and increasing

psychotherapy."  (Tr. 267).  However, Plaintiff "declined psychotherapy and did not want to give up

the Geodon."  (Tr. 267).  Dr. Luth reduced Plaintiff's dosage of Geodon to 20 mg twice day.  (Tr.

267).

On September 15, 2004, Dr. Luth indicated Plaintiff's complaint of left arm numbness was

possibly psychosomatic.  (Tr. 267).  Dr. Luth discussed hospitalization, but Plaintiff refused (Tr. 266).

---

[6]Somatoform disorder is a psychological disorder "marked by physical complaints for which no
organic or physiological explanation is found and for which there is a strong likelihood that
psychological factors are involved ."  *MedlinePlus Encyclopedia* at
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=somatoform%20disorder

A CT scan of Plaintiff's head was normal.  (Tr. 266, 281).  Dr. Luth assessed Plaintiff's condition as

conversion reaction.  (Tr. 266).  Dr. Luth also increased Plaintiff's dosage of Geodon.  (Tr. 266).

On September 23, 2004, Dr. Luth noted that Plaintiff "was accomplishing all activities of daily

living and [did] not seem under any unusual stress at [that] time."  (Tr. 266).  Dr. Luth also noted that

Plaintiff was responding to the increased dose of Geodon.  Dr. Luth referred Plaintiff  to Dr. Sairam for

a psychiatric consultation and medication management.  (Tr. 266).  On December 29, 2004, Dr. Luth

noted that Plaintiff was very distraught and upset.  (Tr. 265).  Dr. Luth increased Plaintiff's dosage of

Geodon to 20 mg three times a day.  (Tr. 265).

On January 28 2005, Dr. Luth gave Plaintiff Imitrex and samples of Axert for her migraine

headaches.  (Tr. 263). On March 1, 2005, Plaintiff indicated that the frequency of her migraines

decreased once she had restarted Depakote.  (Tr. 263).  Dr. Luth reported that Plaintiff was taking

Geodon and was doing better from a pseudo seizure standpoint. (Tr. 263).

On April 21, 2005, Dr. Luth noted that Plaintiff did not follow through with the recommended

psychotherapy for psychosomatic symptoms.  (Tr. 290).  Dr. Luth also completed a medical

assessment of Plaintiff's ability to do work related activities.  (Tr. 292).  Dr. Luth noted Plaintiff's

generalized weakness, but opined that Plaintiff could lift 20 pounds frequently.  (Tr. 292).  Dr. Luth

indicated that Plaintiff could stand/walk for a total of 8 hours, but she occasionally used a cane, and she

could stand/walk without interruption for one half hour or less secondary to weakness.  (Tr. 293).  Dr.

Luth also opined that Plaintiff could sit for a total of 8 hours without interruption.  (Tr. 293).   Dr. Luth

indicated that Plaintiff could occasionally stoop, crouch, kneel, or crawl, but could not climb or balance.

(Tr. 294).

Furthermore, Dr. Luth noted that Plaintiff could not handle or feel, due to numbness in her left hand.  (Tr. 294).  Dr. Luth also opined that Plaintiff could not be around heights or moving machinery, due to pseudo seizures and conversion reaction.  (Tr. 295).

Finally, Dr. Luth indicated that Plaintiff had poor to no ability: (a) to deal with the public, (b) use judgment, (c) interact with supervisors, (d) deal with work stresses, and (e) behave in an emotionally stable manner.  (Tr. 296-98).  Dr. Luth also opined that Plaintiff had a fair ability: (a) to relate to co-workers, (b) function independently, (c) maintain attention and concentration, (d) understand and carry out complex and detailed job instructions, and (e) demonstrate reliability.  (Tr. 297-98).

## V.   TESTIMONY AT ADMINISTRATIVE HEARING

An administrative hearing took place before ALJ Gatto on April 28, 2005.  (Tr. 299.)   Plaintiff and Norman Mastbaum, a vocational expert, testified at the hearing.  (T. 299).

Plaintiff testified that she is married and has three children between the ages thirteen and sixteen. (Tr. 304).  Plaintiff previously worked as a cashier, but had to stop working because she could not stand on her left leg. (Tr. 305).

Plaintiff testified that on a typical day, she cleans the house, goes for a walk (a couple of blocks), and takes care of her children when they come home from school.  (Tr. 306-07).  She stated that her husband or her daughter helps her with the cooking and her kids clean the dishes.  (Tr. 306). Plaintiff testified that she has difficulty carrying the laundry basket up and down the stairs and it is hard for her to vacuum.  (Tr. 306).

Plaintiff stated that she does not drive and never had a driver's license.  (Tr. 307). Plaintiff does

the grocery shopping, but her husband drives her to the store.  (Tr. 307).  She sometimes watches television and tries to go to church every week.  (Tr. 307-08).

Plaintiff testified that Dr. Luth prescribed Depakote for her headaches and Geodon for her seizures and depression.  (Tr. 310).  Plaintiff also testified that she was not seeing a psychiatrist or psychologist.  (Tr. 310).

Plaintiff stated that she had left-sided weakness since her last stroke in November 2002 and indicated that she had to use a cane to walk.  (Tr. 316-17).  Plaintiff also testified that she could lift 10 pounds, stand for 15 to 20 minutes, walk for about 20 minutes, and had no problems sitting.  (Tr. 320).

The vocational expert, Norman Mastbaum, also testified at the administrative hearing  (Tr. 321).  The ALJ posed a hypothetical to the vocational expert ("VE") which limited Plaintiff to performing light work and the VE testified that Plaintiff could perform light work as a cashier and housekeeper.  (Tr. 322).  The VE also testified that Plaintiff could perform work as a cashier if the hypothetical were changed to sedentary work.  (Tr. 322-23).  The VE also stated that "the sedentary cashiers would need to be in a wider space."  (Tr. 323).

On June 20, 2005, the VE responded to the ALJ's post hearing interrogatories.  The VE indicated that Plaintiff could not perform her past relevant work.  (Tr. 158).  The VE also indicated that Plaintiff could perform work as a parking lot cashier, a press tender, and an assembly machine tender.  (Tr. 160).

## VI.  THE ALJ'S FINDINGS AND DECISION

On August 25, 2005, ALJ Gatto issued his decision denying Plaintiff's application for DIB. The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or has

lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C.

§§ 416(i)(1)(A). The ALJ followed the sequential five-step procedure as set out in the rules. *See* 20

C.F.R. §§ 404.1520(a)(4) and 416.920(a). The Eighth Circuit has summarized these steps as follows:

> The Commissioner must determine: (1) whether the claimant is presently engaged in
> "substantial gainful activity;" (2) whether the claimant has a severe impairment--one that
> significantly limits the claimant's physical or mental ability to perform basic work
> activities; (3) whether the claimant has an impairment that meets or equals a
> presumptively disabling impairment listed in the regulations (if so, the claimant is
> disabled without regard to age, education, and work experience); (4) whether the
> claimant has the residual functional capacity [RFC][7] to perform his or her past relevant
> work; and (5) if the claimant cannot perform the past work, the burden shifts to the
> Commissioner to prove that there are other jobs in the national economy that the
> claimant can perform.

*Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998).

Based on the above, the ALJ determined that Plaintiff met the requirements for the first two

steps of the disability determination procedure. (Tr. 15-16). The ALJ found that Plaintiff has not

engaged in substantial gainful activity since November 17, 2002. (Tr. 15). Regarding the second step,

the ALJ found that Plaintiff's "history of drug abuse, pseudo seizures/conversion disorder, depression,

anxiety, somatoform disorder, and the headaches" are considered "severe" based on the requirements

in regulations. (Tr. 29). Regarding step three, the ALJ found that Plaintiff's impairments "do not meet

or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4." (Tr.

29). The ALJ explained that Plaintiff's allegations regarding her limitations were not fully credible. (Tr.

---

[7]A claimant's RFC is the most the claimant can still do despite the claimant's physical and/or
mental limitations. 20 C.F.R. § 404.1545.

29).

The ALJ then proceeded to evaluate Plaintiff's RFC.  The ALJ determined that Plaintiff had the RFC for light work which involves lifting no more than 20 pounds occasionally and 10 pounds frequently; standing and/or walking 6 hours of an 8 hour day or sitting most of the time with some pushing of arm or leg controls.  (Tr. 29).  Plaintiff requires a sit/stand option every twenty minutes.  (Tr. 29).  Also, Plaintiff cannot work at heights or on ladders and Plaintiff cannot work with dangerous, hazardous, or moving machinery.  (Tr. 29).  Plaintiff cannot do any climbing or balancing and can only do occasional stooping, crouching, kneeling, or crawling.  Also, Plaintiff "has the ability to understand, remember, and carry out simple, unskilled, and concrete one to two step[] tasks that are routine and repetitive in nature, in a low stress environment free of drugs, and with superficial contact with the public, co-workers, and supervisors."  (Tr. 29).  The ALJ also noted that Plaintiff is a younger individual with a high school education and no transferrable skills from any past relevant work. (Tr. 29).

Based on the RFC, and considering Plaintiff's age, education, past work experience, the testimony of the VE, and the VE's responses to the post hearing interrogatories, the ALJ determined that Plaintiff could not perform her past relevant work.  (Tr. 28).  But, the ALJ concluded that Plaintiff could perform the jobs of a parking lot attendant, press tender, or assembly machine tender.  (Tr. 29).  Accordingly, ALJ Gatto found that Plaintiff was not disabled under the regulations imposed by the Social Security Act.  (Tr. 29-30).

## VII.   DISCUSSION

### A.   *Standard of Review*

This Court will affirm the ALJ's findings that the claimant was not under a disability if the

findings are supported by substantial evidence based on a review of the entire record. *Haley v.*

*Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). "Substantial evidence is less than a preponderance,

but enough that a reasonable mind might accept it as adequate to support a decision." *Id.* (quoting

*Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). The review the Court undertakes, however,

must go beyond solely the examination of the record for evidence in support of the Commissioner's

decision. *Id.* The Court must additionally examine the record for evidence that detracts from that

decision. *Id.* Nevertheless, as long as there is substantial evidence to support the decision, this Court

will not reverse it simply because substantial evidence exists in the record that would support a contrary

outcome or because this Court might have decided differently. *Id.*

B.      *Analysis of Decision*

Plaintiff argues that this Court should reverse the ALJ's unfavorable decision for several

reasons. First, Plaintiff argues that the ALJ failed to assign proper weight to the opinion of Plaintiff's

treating physician. Plaintiff also asserts that the ALJ erred in his determination of Plaintiff's credibility.

Next, Plaintiff argues that the ALJ failed to allow the medical expert to appear and testify after notice of

the medical expert's attendance was made. Finally, Plaintiff argues that the ALJ's finding that jobs

existed within Plaintiff's RFC was not supported by substantial evidence.

**The ALJ Considered the Opinion of Dr. Luth**

Generally, "a treating physician's opinion is due controlling weight if that opinion is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent

with the other substantial evidence in the record." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001)

(quotations omitted); 20 C.F.R. § 404.1527(d)(2). However, a statement from a medical source that a

14

claimant is "disabled" or "unable to work" does not necessarily mean that the Commissioner will find the claimant disabled. 20 C.F.R. § 404.1527(e)(1); *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004). Moreover, it is appropriate for the ALJ to disregard a treating physician's opinion when it "consists of nothing more than vague, conclusory statements." *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004).

Dr. Luth is the primary care physician who treated Plaintiff for over three years and prescribed medications for Plaintiff's physical and psychological conditions. Plaintiff argues that the ALJ should have given more weight to Dr. Luth's opinion.

On April 21, 2005, Plaintiff's treating physician, Dr. Luth, completed an evaluation regarding Plaintiff's work related activities. (Tr. 292). Dr. Luth opined on Plaintiff's mental condition by finding that she had poor or no ability to deal with public, use judgment, interact with supervisors, deal with work stresses and behave in an emotionally stable manner.

However, the ALJ reasonably considered Dr. Luth's opinion and explained that Plaintiff appeared to do well when she was compliant with her treatment. (*See e.g.* Tr. 23, 263, 269, 271-72). However, Plaintiff did not always follow through with her doctor's recommendations regarding her treatment. (Tr. 289, 290). Nonetheless, the ALJ still limited Plaintiff to only "simple, unskilled, and concrete one to two step[] tasks that are routine and repetitive in nature, in a low stress environment free of drugs; and with superficial contact with the public, co-workers, and supervisors." (Tr. 29). The Court finds that ALJ appropriately gave Dr. Luth's opinion on Plaintiff's mental limitation less weight because Dr. Luth's speciality was in family practice and not mental health. *See* 20 C.F.R. § 416.927(d)(5); *Turley v. Sullivan*, 939 F.2d 524, 527 (8th Cir. 1991) ("the treating physician's

15

opinion is subject to criticism as being outside his or her area of expertise").

Plaintiff argues that Dr. Luth's opinion was supported by the other medical evidence in the record. On January 16, 2003, Dr. Deborah Croker noted that she suspected conversion reaction when Plaintiff sought treatment for weakness and dizziness at the hospital. On January 18, 2003, Dr. William Keig noted that Plaintiff's chest pain could be part of a conversion reaction. Dr. Ana Patricia Groeschel indicated that Plaintiff's problems of weakness and headaches were attributable to depression. On July 16, 2003, Lori Wegner, LICSW, noted that her impression was to rule out a conversion disorder.

However, the record shows that the ALJ found that Plaintiff had pseudo seizures or a conversion disorder which is consistent with Dr. Crocker's and Dr. Keig's statements. (Tr. 29). Moreover, the statements by Dr. Croker and Dr. Keig do not bolster Dr. Luth's opinion on Plaintiff's mental limitations. Dr. Groeschel did not indicate any mental limitations for Plaintiff due to depression and even noted that Plaintiff did not want to be on medication for depression (Tr. 209). Ms. Wegner, who performed a mental evaluation of Plaintiff, recommended that Plaintiff attend an outpatient mental health treatment center to deal with her issues. (Tr. 226). But, Plaintiff stated that she was not interested in any mental health services. (Tr. 226).

The ALJ also considered Dr. Luth's opinion on Plaintiff's physical limitations and gave Dr. Luth's opinion weight. The ALJ's finding was consistent with Dr. Luth's opinion. The ALJ limited Plaintiff to lifting no more than 20 pounds and 10 pounds frequently. (Tr. 29). Dr. Luth opined that Plaintiff could lift 20 pounds frequently and noted generalized weakness. (Tr. 292). The ALJ limited Plaintiff to standing/walking for six hours in an eight-hour day with a sit/stand opinion every 20 minutes.

16

(Tr. 29).  Dr. Luth opined that Plaintiff could stand and/or walk for a total of 8 hours, but she

occasionally used a cane, and she could stand and/or walk without interruption for a half hour or less

secondary to weakness.  (Tr. 293).

The ALJ concluded that Plaintiff could not climb or balance which was the same as Dr. Luth's

opinion.  (Tr. 29, 294).  The ALJ also found that Plaintiff could occasionally stoop, crouch, kneel, or

crawl, which was the same as Dr. Luth's assessment. (Tr. 29, 294).  The ALJ found that Plaintiff could

not work with ladders, heights, or dangerous, hazardous, or moving machinery.  (Tr. 29).  Dr. Luth

opined that Plaintiff could not be around heights or moving machinery due to pseudo seizures and

conversion reaction.  (Tr. 295).  Thus, the ALJ's assessment was consistent with Dr. Luth's opinion

and the medical evidence.

Dr. Luth also opined that Plaintiff could not handle or feel because of numbness in her left hand.

(Tr. 294).  However, the ALJ "did not find any manipulative limitations" because Plaintiff "has

consistently had normal neurological evaluations" and normal grip strength (Tr. 23, 202, 220, 272).

The Court finds that the ALJ's assessment was supported by substantial evidence and appropriately

gave Dr. Luth's opinion some weight based on the record.

### Plaintiff's Subjective Complaints Lacked Credibility

In determining the credibility of a claimant's subjective complaints, the ALJ looks to several

factors as set out in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).  These factors include: (1)

daily activities; (2) duration, frequency and intensity of pain; (3) dosage and effectiveness of medication;

(4) precipitating and aggravating factors; and (5) functional restrictions.  *Id.* at 1322.  These factors

must be considered in the light of "the claimant's prior work record, and observations by third parties

17

and treating and examining physicians . . . ." *Id.*  "[A]n ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them."  *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (citations omitted).  An ALJ may, however, discount a claimant's subjective complaints if the complaints are inconsistent with the record as a whole.  *Id.* at 792.

An ALJ who determines that a claimant's subjective complaints lack credibility must "make an express credibility determination explaining his reasons for discrediting the complaints."  *Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995) (quoting *Ghant v. Bowen*, 930 F.2d 633, 637 (8th Cir.1991)).

Plaintiff argues the ALJ failed to consider that she had difficulties in accomplishing her daily activities.  Plaintiff testified that she sometimes cleans the house the and does all the cooking for the family, but other times she requires assistance from family members.  (Tr. 307).  Plaintiff also testified that her children do the dishes.  (Tr. 307).  Plaintiff stated that she walks very slowly and uses a cane when she does activities with her family outside the house.  (Tr. 318).   However, the ALJ acknowledged that some of Plaintiff's activities were done at a slower pace and were difficult for her.

Here, the ALJ stated that Plaintiff's "allegations and subjective complaints are found not to be fully credible when considered in light of the evidence."  (Tr. 22).  The ALJ explained how the objective medical evidence was inconsistent with Plaintiff's complaints of disabling pain.  (Tr. 22-29.) However, the ALJ did not base his decision solely on the objective medical evidence, but also discussed the functional restrictions as set forth by physicians and the vocational expert.  The ALJ discussed the dosage and effectiveness of the medication prescribed to Plaintiff, including Plaintiff's

noncompliance with her doctors' treatments and recommendations.   The ALJ also noted Plaintiff's

inconsistent and vague statements regarding the alleged frequency of her seizures.

In addition, the ALJ discussed Plaintiff's daily activities and how these factors related to the

determination of credibility.  The ALJ stated Plaintiff "takes care of her personal needs, cleans the

house, goes for daily walks, takes care of her children, and cooks for her family, but she does these

chores at a slower pace." (Tr. 24).  The ALJ acknowledged that it was hard on Plaintiff when she did

the laundry and vacuuming. (Tr. 24).   Plaintiff's other activities included going to the amusement park

with her family, shopping, going to church, eating out, playing cards, and taking the bus.  (Tr. 20, 129-

30, 136, 307-09, 318).

The Court finds that the ALJ reasonably concluded that Plaintiff's daily activities were

inconsistent with Plaintiff's claim of total disability.   *See e.g., Dunahoo v. Apfel,* 241 F.3d 1033, 1038

(8th Cir. 2001) ("[H]er daily activities are inconsistent with the disabling level of pain she has alleged . .

. .").

Plaintiff also argues that the ALJ failed to consider how Plaintiff's conversion disorder caused

her to believe that her condition was a physical one rather than a psychological one, and consequently,

sought treatment from her family physician and emergency room physicians as opposed to a

psychotherapist.  Plaintiff argues that it was her mental impairment that caused her to believe she had a

stroke when she did not.

However, the record shows that Plaintiff took medication for a mental condition (Risperdal and

Geodon), but simply refused to seek further treatment for mental health issues.  The Court finds that the

ALJ reasonably concluded that Plaintiff's refusal to seek mental health treatment contradicted her

19

alleged complaints concerning her impairments. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (finding that a claimant's failure to follow a doctor's prescribed treatment without good reason is grounds for denying benefits).

An ALJ's credibility finding is entitled to considerable deference. *See Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996) (the court "will not substitute [its] opinion for that of the ALJ, who was in a better position to assess [the claimant's] credibility."). Here, the ALJ's credibility finding was reasonable and supported by the evidence in the record. Therefore, the Court will not disturb the ALJ's assessment. *See Hensley v. Barnhart*, 352 F.3d 353 (8th Cir. 2003).

### The ALJ is Not Required to Seek a Medical Expert Opinion

Plaintiff argues that the ALJ "erred by failing to allow the medical expert to testify." [Docket No. 9]. Plaintiff asserts that the ALJ deprived her of the chance to elicit testimony from the expert about whether her impairments equaled the listings under the Social Security regulations.

An ALJ may ask for and consider opinions from medical experts in evaluating the medical evidence. 20 C.F.R. § 416.927(f)(2)(iii).

Here, the ALJ reviewed Plaintiff's testimony and the medical evidence regarding her conditions. The evidence supports the ALJ's decision that none of Plaintiff's physical or mental impairments, considered individually or in combination, meet or equal any listed impairments under the regulations. Thus, based on the evidence in the record, the ALJ reasonably concluded that a medical expert was not required at the administrative hearing in this case.

### The ALJ Reasonably Concluded that Plaintiff Could Perform Other Jobs

Plaintiff contends the ALJ's finding that she could perform the jobs of parking lot attendant,

20

press tender, or assembly machine tender was not supported by substantial evidence.  Plaintiff argues

that she could not work with moving machinery and could only work in an open space.

"A hypothetical question need only include those impairments that the ALJ accepts as true."

*Haynes v. Shalala*, 26 F.3d. 812, 815 (8th Cir. 1994).

The ALJ appropriately adjusted Plaintiff's RFC after considering her subjective complaints and

the medical evidence.  The ALJ requested that the VE consider whether Plaintiff could perform other

jobs based on her RFC.   The VE found that Plaintiff could perform the jobs of parking lot cashier[8]

(1,100 jobs), press tender (1,500 jobs), and assembly machine tender (1,250 jobs).  (Tr. 160).  The

ALJ's conclusion that Plaintiff could perform other jobs was based on substantial evidence.

## VIII.   CONCLUSION AND RECOMMENDATION

Accordingly, the Court **recommends** that Plaintiff's Motion for Summary Judgment [Docket

No. 8 ] **be DENIED** and the Commissioner's Motion for Summary Judgment [Docket No. 15] **be**

**GRANTED.**

Dated: February 13, 2007

s/ Arthur J. Boylan
Arthur J. Boylan
United States Magistrate Judge

---

[8]The VE opined that Plaintiff could perform the job of parking lot cashier in his responses to the
ALJ's post hearing interrogatories.  However, it appears the VE inadvertently provided the DOT
section for a parking lot attendant.  (Tr. 160).

**NOTICE**

Pursuant to Local Rule 72.2 (b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **March 1, 2007.**